UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————X

|  |  |  |
|---|---|---|
| FRANKIE BRETON, | : | **FIRST AMENDED** |
|  | : | **COMPLAINT** |
|  | : |  |
| PLAINTIFF, | : | Jury Trial Demanded |
|  | : |  |
| -against- | : | 17 CV 09247 (RWS)(HBP) |
|  | : |  |
| THE CITY OF NEW YORK; POLICE | : |  |
| OFFICER STEVEN CLARK;   POLICE | : |  |
| SERGEANT FREDDY CRUZ; POLICE | : |  |
| SERGEANT EDWARD CHEEK; JOHN | : |  |
| DOES 1-5, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

———————————————————————X

## NATURE OF ACTION

1.     This civil rights action arises from the New York City Police Department's wrongful arrest of Frankie Breton, a New York University student and intern at a prestigious consulting firm in Manhattan.  Police arrested Breton after his girlfriend's disgruntled ex-boyfriend (and the father of their child) violently attacked Breton with a knife, causing Breton serious injuries.

2.     Rather than arrest the ex-boyfriend, who had a long criminal history and was wanted for stalking Breton and Breton's girlfriend, the police let him go and instead charged Breton with the felony assault of the ex-boyfriend.   The police then prepared a series of false reports claiming Breton committed that crime,

omitting overwhelming evidence that proved Breton was actually innocent.  Police

then forwarded those false reports to the New York County District Attorney's

Office, convincing that Office to commence formal criminal proceedings against

Breton.

3.     Months after Breton's arrest, the New York County District

Attorney's Office independently investigated the charges, discovered they were

false, and dismissed the case against Breton as an obvious case of self-defense.  By

then, however, Breton had spent nearly a day in jail, lost his internship as a result

of the charges which subsequently caused the delay of his graduation from New

York University, spent thousands in legal fees, and suffered an exacerbation of his

injuries due to the police denying him access to proper medical treatment.

4.     The unlawful conduct of the New York City Police Department

violated New York and Federal law and entitles Breton to compensatory and

punitive damages under 42 U.S.C. § 1983, a federal statute authorizing a civil

rights lawsuit based on such conduct.

## JURISDICTION AND VENUE

5.     This action arises under the U.S. Constitution and 42 U.S.C. § 1983.

This Court has subject matter jurisdiction pursuant to 28 U.S.C §§ 1331, 1343(3).

6.     Under 28 U.S.C § 1391(b) and (c), venue is proper in the Southern District of New York because Defendant City of New York resides in that Judicial District.

## PARTIES

7.     PLAINTIFF FRANKIE BRETON ("PLAINTIFF") is a citizen of the United States, residing in the State of New York.  At all relevant times to this complaint, PLAINTIFF was a student at New York University and only a few credits short of graduation.

8.     Defendant CITY OF NEW YORK ("CITY") is a municipal corporation within the State of New York.  Under § 431 of the New York City Charter, the City of New York established and maintains the New York City Police Department, a constituent department or agency.  At all relevant times, the City of New York employed the police personnel involved in the acts underlying this lawsuit.

9.     Defendants STEVEN CLARK ("PO CLARK") and FREDDY CRUZ ("PO CRUZ") were at all times relevant to this complaint, duly appointed and acting police officers employed by the New York City Police Department and assigned to the 33rd Police Precinct in Manhattan.

10.     Defendants FREDDY CRUZ ("SGT. CRUZ") and EDWARD CHEEK ("SGT. CHEEK") were at all times relevant to this complaint, duly

appointed and acting Police Sergeants employed by the New York City Police Department and, upon information and belief, assigned to the 33rd Police Precinct in Manhattan.

11.     Defendant JOHN DOES 1-5 ("DOE 1-5") were at all times relevant to this complaint, duly appointed and acting police officers or supervisory officers employed by the New York City Police Department and assigned to the 33rd Police Precinct in Manhattan.

12.     At all times relevant to this complaint, defendants acted under the color of state law.

## FACTUAL BACKGROUND

**A.     The Disgruntled Ex-Boyfriend Of PLAINTIFF's Girlfriend Begins To Stalk Them**

13.     At all times relevant to this complaint PLAINTIFF's girlfriend was Katherine Tejada ("Tejada").

14.     Tejada resides at 520 West 162nd Street in Manhattan, within the confines of the New York City Police Department's 33rd Precinct,

15.     Tejada's ex-boyfriend is Manuel Matias ("Matias") who is also the father of Tejada's son.

16.     Beginning in early 2016, Matias began a terrifying campaign of abuse and harassment against Tejada, including robbery, burglary, assault, and stalking.

17.     On February 13, 2016, Matias threatened to stab Tejada with a screwdriver.

18.     On August 11, 2016, Matias broke into Tejada's apartment at 520 West 162nd Street in Manhattan, by climbing the fire escape and entering through a window.

19.     On August 13, 2016, Matias physically assaulted Tejada as she returned home from work, and attempted to steal her purse.

20.     Tejada filed Domestic Incident Reports for each of the above crimes with the 33rd Precinct.

21.     As a result of Tejada's complaints, in August 2016, the NYPD issued an "I-card" or "Wanted" card for Matias's arrest.

22.     On August 23, 2016, Matias stalked PLAINTIFF and Tejada in upper Manhattan.

23.     PLAINTIFF promptly called 911 to report the incident, but after waiting for police and fearing for their safety, PLAINTIFF and Tejada went to the 33rd Precinct and filed yet another Domestic Incident Report against Matias.

**B.    The Ex-Boyfriend Assaults PLAINTIFF And Slashes PLAINTIFF's Hand With A Knife**

24.     On October 21, 2016, PLAINTIFF began an internship at a prestigious consulting firm located in midtown Manhattan.  By completing the

internship, PLAINTIFF would obtain enough credits to enable him to graduate from New York University with a bachelor's degree.

25.     After leaving the first day of his internship at approximately 5:45 p.m. PLAINTIFF traveled by subway to Tejada's apartment.

26.     Around this time, Matias came to Tejada's apartment and began banging on her door, located off the lobby on the ground floor.  Tejada, who was inside her apartment at the time, was terrified and called 911.  She reported Matias' threatening conduct to the police and informed them that she believed she had an Order of Protection in her favor against Matias.

27.     As Matias banged on Tejada's door, PLAINTIFF entered the lobby of Tejada's apartment building.  Upon seeing PLAINTIFF, Matias stated "That's Homeboy! It's on!" and physically attacked PLAINTIFF by striking PLAINTIFF numerous times with a closed fist about his body.

28.     As Matias attacked PLAINTIFF, PLAINTIFF backed out of the building onto the sidewalk in front of Tejada's apartment building.

29.      Matias then produced a knife and began slashing at PLAINTIFF, resulting in lacerations to PLAINTIFF'S right hand and his body.

30.     Fearing for his life, PLAINTIFF tried to disarm Matias.

31.     PLAINTIFF and Matias tumbled onto the sidewalk and, upon impact, Matias lost control of the knife, which was picked up by PLAINTIFF.

32.     Still fearing for his life, PLAINTIFF began to back-up down the street away from Matias.

33.     PLAINTIFF placed Matias' knife in his pants pocket and Matias began to chase PLAINTIFF.

34.     Midway down the block Matias stopped to unearth a wooden support that was attached to a sapling, and then continued to chase PLAINTIFF down the street while holding the wooden support.

35.     PLAINTIFF ran away from Matias and called 911 to report the crime committed against him.

**C.     Defendants Disregard Overwhelming Evidence Of PLAINTIFF's Innocence And The Ex-Boyfriend's Guilt, And Arrest PLAINTIFF For Assaulting The Ex-Boyfriend**

36.     After running away from Matias, PLAINTIFF flagged down a police car.

37.     PLAINTIFF explained to the police that he had been attacked by Matias, and was directed to get in the backseat of the police car.  Police then drove PLAINTIFF back to Tejada's apartment building.

38.     As PLAINTIFF was being transported to Tejada's apartment, another police car arrived there responding to Tejada's 911 call.

39.     The responding officers went to Tejada's apartment but they were

having difficulty getting inside because Matias' had knocked it off the hinges and

wedged it into the frame by the force of his banging.

40.     Police did, however, encounter Matias in the lobby of Tejada's

apartment building.

41.     When PLAINTIFF arrived at Tejada's building, he exited the back of

the police car.   At the same time, Matias was exiting Tejada's building.

42.     Matias saw PLAINTIFF and began screaming to police, "That's him!"

43.     One of the police officers, PO CRUZ, asked PLAINTIFF is he

stabbed Matias.

44.     PLAINTIFF, who was bleeding from his right hand, displayed his

bleeding hand to PO CRUZ and said, "No, he stabbed me."

45.     PO CRUZ then searched PLAINTIFF and found Matias's knife in

PLAINTIFF's pants pocket.

46.     PLAINTIFF explained to PO CRUZ that it was Mathis who had

attacked and cut PLAINTIFF, and that PLAINTIFF obtained the knife by

disarming MATIAS.

47.     Additionally, Tejada, from inside her apartment, told PO CLARK

several times that Matias was the person who had been pounding on her door and

that he was the subject of several Domestic Incident Reports she had filed with the 33rd Precinct and, she believed, an valid Order of Protection in her favor.

48.     PO CLARK asked Tejada for Matias' description and Tejada explained to PO CLARK that Matias was bald and had green eyes person.

49.     In contrast,  PLAINTIFF had short hair and brown eyes.

50.     While police were on the scene, a female witness identified Matias to police as the person who possessed the knife recovered from PLAINTIFF's pants pocket.

51.     The female witness told a police officer, Grove, that she saw two men fighting and then pointed Matias out to Police Officer Grove as the person who possessed the knife.

52.     Police Officer Grove relayed this information to the other officers at the scene and to SGT. CRUZ, who in turn directed JOHN DOE 1 to obtain the female witness' pedigree information and written statement.  Defendant JOHN DOE 1, however, failed to record that information.

53.     Notwithstanding the above, SGT. CRUZ then ordered PO CLARK to handcuff PLAINTIFF and place him under arrest *for assaulting Matias.*

54.     At the time PLAINTIFF was placed under arrest, virtually all of the officers and supervisors at the scene were aware of the above exculpatory

information, yet none of them intervened to stop CLARK or SGT. CRUZ from arresting PLAINTIFF.

**D.     The Ex-Boyfriend Appears At The Precinct To Aid In Filing A False Police Report Against PLAINTIFF, And Police Fail To Check For The Numerous Complaints Both PLAINTIFF and His Girlfriend Informed Them They Filed Against The Ex-Boyfriend**

55.     Matias was taken back to the 33rd Precinct to provide a statement regarding the incident.  Based solely on Matias' totally incredible claim, police charged PLAINTIFF with Attempted Assault in the First Degree, a felony under New York Penal Law §§ 110/120.10 (1).

56.     PO Clark then prepared NYPD arrest and complaint reports falsely stating PLAINTIFF slashed Matias' head with a knife, PLAINTIFF and Matias were strangers, and there were no prior Domestic Incident Reports prepared for Matias.  PO CLARK's false reports, despite all of the above contradicting evidence (¶¶ 1-54), were then approved by SGT. CHEEK for filing and presentation to the New York County District Attorney's Office, which was required to decide whether to bring a formal criminal prosecution against PLAINTIFF.

57.     On October 21, 2016, PO CLARK prepared a felony complaint charging PLAINTIFF with Attempted Assault in the First Degree.

58.     Critically, PO CLARK's reports and felony complaint omitted dispositive evidence establishing PLAINTIFF's innocence, the lack of probable cause for his arrest, and the falsity of the very factual basis upon which the felony

complaint relied.  For example, the felony complaint averred that PO CLARK had

been informed by an informant —Matias— that PLAINTIFF slashed Matias' head

with a knife causing multiple lacerations and bleedings.

59.    However, PO CLARK negligently, recklessly, intentionally, or with

deliberate indifference, omitted from the felony complaint that:

    (a)    Matias was a wanted criminal for his campaign of terror against
           Tejada and PLAINTIFF,

    (b)    PLAINTIFF was Tejada's current boyfriend,

    (c)    Matias was Tejada's ex-boyfriend,

    (d)    PLAINTIFF and Matias were known to each other,

    (e)    The incident involved a domestic dispute,

    (f)    A witness at the scene identified Matias as the individual
           who possessed the knife and who was the aggressor,

    (g)    Both Tejada and PLAINTIFF had called 911 based on Matias'
           unauthorized presence and conduct,

    (h)    PLAINTIFF had injuries consistent with his account of
           being attacked by Matias with a knife, and

    (i)    Matias had *no injuries* supporting his claim that PLAINTIFF
           attacked him with a knife.

60.    PO CLARK's felony complaint was false or misleading by omission.

61.    Upon information and belief, neither PO CLARK or any other police

officer or sergeant conveyed the above facts to the New York County District

Attorney's Office.  Nor did PO CLARK or any other police officer or sergeant

inform that Office of the other exculpating details, including that the female witness had provided police with an account of the crime that exculpated PLAINTIFF, incriminated Matias and rendered Matias' account unworthy of belief.

62.    In contrast to PLAINTIFF, who was processed through the system as a criminal, Matias was allowed to leave the precinct even though there was an active "Wanted" card for him issued by the detective squad on the second floor of the same building.

63.    Upon information and belief, neither PO CLARK or any other officer ran Matias's pedigree information through any database.  Had they done so, they would have seen that Matias was a wanted criminal and the subject of multiple complaints as alleged by PLAINTIFF and Tejada.

64.    PLAINTIFF was arraigned in New York City Criminal Court, New York County, on October 22, 2016, and released on his own recognizance.  His case was adjourned until December 14, 2017, for Grand Jury action.

65.    Because PLAINTIFF's hand was still bleeding from the cut Matias inflicted, PLAINTIFF went to New York Presbyterian Hospital for treatment where he was told that sutures were needed but could not be employed due to the age of the injury, which was approximately 24-hours old.   During the time

PLAINTIFF was in NYPD custody, the NYPD had failed to provide PLAINTIFF with the opportunity to receive such sutures.

66.     On the evening of October 22, 2016, PO CLARK returned to Tejada's apartment and with PLAINTIFF present, apologized for arresting PLAINTIFF and for releasing Matias without ascertaining that there was an active I-card for Matias.

67.     PO CLARK also admitted to Tejada that he found out Matias was wanted in the 33rd Precinct and that Matias was released without a pedigree check.

**E.     The District Attorney Dismisses All Charges Against PLAINTIFF**

68.     PLAINTIFF appeared in New York City Criminal Court, New York County, on December 14, 2016.  The case was once again adjourned.

69.     On January 27, 2017, after an investigation by the prosecutor assigned to the case, the New York County District Attorney's Office moved to dismiss all charges against PLAINTIFF.  The court granted that motion the same day, and dismissed the case against PLAINTIFF as an obvious case of self-defense.

**PLAINTIFF'S DAMAGES**

70.     PLAINTIFF's injuries and damages include, but are not limited to:

(a)     His false and malicious prosecution;[1]

(b)     Nearly 21 hours of unjust incarceration;

---

[1]Pursuant to Local Rule 83.10 (1), attached to this Amended Complaint as Exhibit A is PLAINTIFF's CPL §160.50 release for sealed records relating to his arrest and prosecution.

(c)     The restriction of his liberty through incarceration and the multiple court appearances he was required to make to defend against the false charges;

(d)     Mental and emotional damages from being falsely arrested, incarcerated, and required to defend against false charges;

(e)     Shame and humiliation;

(f)     Aggravation of existing injuries from the NYPD's failure to provide prompt and adequate medical treatment for his hand;

(g)     Legal fees and expenses for which he is responsible exceeding $7,500, to fight the false charges;

(h)     His loss of his internship (¶ 24, *supra*) which delayed his graduation from New York University;

(i)     The loss of employment income, and diminution of future earning ability, due to his inability to complete his education; and

(j)     Substantial pain and suffering.

## **FIRST CAUSE OF ACTION**
### **(False Arrest Under State Law; All Defendants)**

71.     PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 70 of this Complaint, and incorporates them here.

72.     Defendants, individually and acting in concert and/or aiding and abetting each other, intended to confine PLAINTIFF.

73.     PLAINTIFF was conscious of that confinement and did not consent to it.

74.     Defendants' confinement of PLAINTIFF was not privileged and

made in disregard of overwhelming evidence of PLAINTIFF's innocence.

75.     As a result of defendants' actions, PLAINTIFF suffered damages as

set forth in ¶ 70, above.

## SECOND CAUSE OF ACTION
### (Malicious Prosecution Under State Law; All Defendants)

76.     PLAINTIFF repeats and realleges each and every allegation contained

in ¶¶ 1 through 75 of this Complaint, and incorporates them here.

77.     By virtue of the foregoing, defendants, acting in concert with, and

aiding and abetting each other, and with additional persons for whose acts they are

liable, initiated, continued, and/or caused the initiation or continuation of, criminal

proceedings against PLAINTIFF.

78.     The criminal proceedings terminated in PLAINTIFF's favor.

79.     There was no probable cause for the commencement or the

continuation of the criminal proceedings.

80.     The defendants acted with actual malice.

81.     The CITY is liable for defendant's actions under the principle of

*respondeat superior*.

## THIRD CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Under State Law;
### All Defendants)

82.     PLAINTIFF repeats and realleges each and every allegation contained

in ¶¶ 1 through 81 of this Complaint, and incorporates them here.

83.     Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at PLAINTIFF until at least January 2017, when the charges against PLAINTIFF were dismissed.

84.     Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, PLAINTIFF severe emotional distress.

85.     Specifically, defendants, individually, and conspiring, acting in concert with and/or aiding and abetting one another and other persons for whose acts they are liable, created false official records to be used against PLAINTIFF, initiated or caused the initiation and continuation of false and unfounded criminal charges against PLAINTIFF while lacking probable cause to do so, and suppressed exculpatory material, including the evidence detailed in ¶¶ 59-60, above, from prosecutors charged with deciding whether to prosecute PLAINTIFF.

86.     PLAINTIFF suffered severe emotional distress as a result of defendants' actions.

87.     By virtue of the foregoing, PLAINTIFF suffered the actual and special damages identified in ¶ 70.

88.     The CITY is liable for defendant's actions under the principle of *respondeat superior*.

## FOURTH CAUSE OF ACTION
**(Actual and Constructive Fraud Under State Law; All Defendants)**

89.     PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 88 of this Complaint, and incorporates them here.

90.     Defendants made representations of material "fact" which were false, and known to be false by defendants, for the purpose of inducing other parties to rely upon such false representations, and the other parties did so rely, in ignorance of the falsity of such representations, to the detriment of PLAINTIFF, thereby causing PLAINTIFF's damages alleged in ¶ 70.  Moreover, defendants had a special or fiduciary duty to PLAINTIFF to refrain from committing such acts and using false or misleading evidence and to provide prosecutors will all exculpatory or impeaching evidence relevant to the charges against PLAINTIFF.

91.     The CITY is liable for defendants' actions under the principle of *respondeat superior*.

### FIFTH CAUSE OF ACTION
**(Wrongful Arrest And Detention Under The Fourth Amendment  and *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017); Sgt. Cruz, Sgt. Cheek, PO Clark, and City)**

92.     PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 91 of this Complaint, and incorporates them here.

93.     Defendants, without probable cause, and in disregard of overwhelming evidence of PLAINTIFF's innocence, wrongfully arrested and detained him at the scene and thereafter for assaulting Matias.

94.     Moreover, defendants, in absence of probable cause for PLAINTIFF's continued seizure, continued the seizure by submitting the false felony complaint to prosecutors and the New York County Criminal Court, which continued the charges against PLAINTIFF and his detention and/or seizure, requiring PLAINTIFF to repeatedly appear in court to defend against the charges over a period of several months.

95.     By virtue of the foregoing, defendants are liable for PLAINTIFF's wrongful arrest and detention, and the damages set forth in ¶ 70 above.

### SIXTH CAUSE OF ACTION
**(42 U.S.C. §1983;   Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments; All Defendants)**

96.     PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 95 of this Complaint, and incorporates them here.

97.     The individual defendants, by virtue of the foregoing, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against PLAINTIFF.

98.     The criminal proceedings terminated in PLAINTIFF's favor.

99.     There was no probable cause for the commencement or the continuation of the criminal proceedings.

100.    The Defendants acted with actual malice.

101.   The aforesaid conduct operated to deprive PLAINTIFF of his rights

under the Constitution and the Laws of the United States:

> (a)   Not to be arrested, prosecuted, detained, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including false allegations in violation of the Fourth and Fourteenth Amendments, and the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments, to the U.S. Constitution; and

> (b)   Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

102.   The foregoing violations of PLAINTIFF's federal constitutional rights

by the defendants, together with their co-conspirators and accomplices, known and

unknown, directly, substantially, proximately, and foreseeably caused the

continuation of PLAINTIFF's malicious prosecution without probable cause, and

his other injuries and damages.

103.   The foregoing violations of PLAINTIFF's rights amounted to

Constitutional torts and were affected by actions taken under color of State law,

and within the scope of the Defendants' employment and authority.

104.   Defendants committed the foregoing violations of PLAINTIFF's

rights knowingly, intentionally, willfully, recklessly, negligently, and/or with

deliberate indifference to PLAINTIFF's constitutional rights.

105.   By reason of the foregoing, the defendants are liable for the damages set forth in ¶ 70 above.

## SEVENTH CAUSE OF ACTION
**(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth, Sixth,**
**and Fourteenth Amendments; Sgt. Cruz, Sgt. Cheek, PO Clark, and City)**

106.   PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 105 of this Complaint, and incorporates them here.

107.   SGT. CRUZ, SGT. CHEEK, and PO CLARK, acting in concert and aiding and abetting the other, created false police and felony complaint reports omitting the exculpatory information detailed in ¶¶ 59, and alleging PLAINTIFF slashed Matias' head with a knife, PLAINTIFF and Matias were strangers, and there were no prior Domestic Incident Reports prepared for Matias.

108.   The misleading information contained in those false reports, and the information omitted from them, was likely to influence a jury's decision.

109.   Those defendants then forwarded those reports to prosecutors who in turn relied on them to commence formal criminal proceedings against PLAINTIFF.

110.   Defendants' actions deprived PLAINTIFF of his right to not be prosecuted on fabricated evidence, and to a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, and were the proximate cause of PLAINTIFF's injuries (¶ 70).

## EIGHTH CAUSE OF ACTION
### (Failure To Intervene; 42 U.S.C. § 1983; Fourth, Fifth and Fourteenth Amendments; Sgt. Cruz, Sgt. Cheek, and Does 2-5)

111.   PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 110 of this Complaint, and incorporates them here.

112.   Defendants, who were present at the scene and had direct knowledge of the violation of PLAINTIFF's Fourth, Fifth and Fourteenth Amendment rights through his wrongful arrest and detention, and malicious prosecution, exhibited deliberate indifference and/or gross negligence concerning PLAINTIFF's rights by failing to intervene to prevent the violation of those rights by their peers and subordinates, even though they had legal and constitutional obligations to do so.

113.   Rather than intervene, defendants directly participated in, ratified, and aided and abetted, the violation of  PLAINTIFF's constitutional rights as set forth above.

114.   Each of the defendants had a realistic opportunity to intervene and prevent the harm PLAINTIFF suffered, a reasonable person in defendants' positions would know that PLAINTIFF's rights were being violated, and none of the defendants took reasonable steps to intervene.

115.   The defendants, by virtue of the foregoing, are liable for the damages set forth in ¶ 70 above.

## NINTH CAUSE OF ACTION
### (Claim Under *Monell v. Department of Social Services*,

**436 U.S. 658 (1978) against City for actions of the NYPD)**

116.   PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 91 of this Complaint, and incorporates them here.

117.    The foregoing violations of PLAINTIFF's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the CITY, amounting to deliberate indifference to the constitutional rights of persons, including PLAINTIFF, who are investigated, arrested, or prosecuted for alleged criminal activities.

118.    Prior to PLAINTIFF's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

(a)    The determination of probable cause to make an arrest; and

(b)    the duty not to use false, misleading or unreliable evidence;

(c)    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a

prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

119.    The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal          cases;

(b)    that such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

120.   Those policymakers and officials had knowledge and notice that adequate polices regarding hiring, retention and supervision were necessary with respect to rank and file police officers and their supervisors, and that failing to

implement such policies would result in the violation of the constitutional rights of

individuals investigated and arrested by the NYPD, based upon, among other

things:

(a)     credible allegations, many substantiated by judicial decisions, finding NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony, and lawsuits settled by the City for substantial sums based on malicious prosecution claims, (concerning which the NYPD conducted no investigation  into the alleged misconduct by the suspect employees) (*see* Exh. B appended and incorporated herein by reference, listing some of those decisions and settlements);

(b)     numerous decisions of the U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as  the probable cause requirement of the Fourth Amendment;

(c)     judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their *Brady* obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra*;

(d)     formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the New York City Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

(e)   the "Mollen Report," a 1994 NYC government report on corruption in the NYPD, *see Collins v. City of New York*, 923 F. Supp.2d 462, 478 (E.D.N.Y. 2013) (Block, J.);

(f)   overwhelming media coverage concerning the problem of NYPD officers lying and the NYPD's failure to address the issue, *see Cordero v. City of New York*, 15-CV-3436, Memorandum and Order, Oct. 17, 2017, pp. 4,  22. n. 1 & 2 (E.D.N.Y.) (Weinstein, J.) (citing a plethora of newspaper articles giving the NYPD notice of the problem and holding PLAINTIFF produced sufficient evidence for a jury to conclude the NYPD's failure "to take reasonable steps to control lying by police officers is a policy of the NYPD."); and

(g)   the inherent obviousness of the need to supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

121.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), has final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of Brady material.

122.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

123.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to PLAINTIFF, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

124.    The aforesaid policies, procedures, regulations, practices and/or customs of Defendant City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of PLAINTIFF's rights under the Constitution and laws of the United States.

125.    By virtue of the foregoing, Defendant City of New York is liable for having substantially caused the foregoing violations of PLAINTIFF's constitutional rights and his constitutional injuries, and causing PLAINTIFF to suffer the actual damages identified in ¶ 70.

## TENTH CAUSE OF ACTION
**(Negligent Hiring, Training, and Supervision Under State Law; Defendant City of New York)**

126.    PLAINTIFF repeats and realleges each and every allegation contained in ¶¶ 1 through 125 of this Complaint, and incorporates them here.

127.   By virtue of the foregoing, defendant City of New York is liable to PLAINTIFF because of its intentional, deliberately indifferent, careless, reckless, and/or grossly negligent hiring, retention, and supervision of its agents, servants and/or NYPD employees with regard to their duties, including:

(a)   the duty not to use false, misleading or unreliable evidence;

(b)   the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, and statements;

(c)   the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and prosecutors, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

128.   Policymaking and supervisory officials for the New York City Police Department and the City had legal and constitutional obligations to prevent their employees from violating the above duties.

129.   Those policymakers and officials had knowledge and notice that adequate polices regarding hiring, retention and supervision were necessary with respect to rank and file police officers and their supervisors, and that failing to implement such policies would result in the violation of the constitutional rights of

individuals investigated and arrested by the NYPD, based upon, among other things, the facts set forth in ¶ 120, above.

130.   By virtue of the foregoing, PLAINTIFF suffered the actual damages identified in ¶ 70.

## **DAMAGES DEMAND**

WHEREFORE, PLAINTIFF demands judgment against the defendants as follows:

      a.     For compensatory damages of not less than $500,000;
      b.     For punitive damages against the individual defendants of $1,000,000;
      c.     For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;
      d.     For pre-judgment interest as allowed by law; and
      e.     For such other and further relief as this Court may deem just and proper.

DATED:    New York, New York
           December 21, 2017

                                    _____
                                    ANDREW M. STENGEL, ESQ.
                                    The Law Firm of Andrew M. Stengel, P.C.
                                    11 Broadway
                                    Suite 615
                                    New York, New York 10004
                                    *Attorney For PLAINTIFF Frankie Breton*